UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

VS.                                        CRIMINAL NO. 3:08CV51TSL-FKB

JAMES TODD PHILLIPS

MEMORANDUM OPINION AND ORDER

On October 16, 2008, defendant Todd Phillips pled guilty to
one count of conspiracy to commit bank fraud in violation of 18
U.S.C. § 1344.  On January 29, 2010, this court, after finding an
actual loss amount of between $2.5 and $7 million, sentenced
Phillips to a 51-month term of imprisonment and to three years of
supervised release.  At that time, the court deferred any finding
with respect to restitution.  Based on evidence and arguments
thereafter presented at an evidentiary hearing on the issue and in
the parties' post-hearing memoranda, the court makes the following
findings and conclusions.

While the April 2, 2008 information charging Phillips
detailed Phillips' fraud only as it related to three victims, the
Presentence Investigation Report (PSIR) described a much larger
scheme to defraud, which it summarized as follows:

> Prosecution in this case is the result of an
> investigation conducted by the Office of Inspector
> General (OIG) with the Federal Deposit Insurance
> Corporation (FDIC) and the Federal Bureau of
> Investigation.

The investigation determined that James Todd
Phillips owned and operated Statewide Realty Holdings,
LLC (Statewide Realty) as a real estate enterprise in
Pike County, Mississippi, and elsewhere, from December
31, 2003, through December 2007.  Phillips was also
president and director of a domestic corporation known
as Todd Phillips Investments, Inc. (TPI), which operated
as a real estate enterprise in Pike County, Mississippi,
and elsewhere, from July 1998 through December 2007.
Statewide Realty and TIP owned real properties
throughout the State of Mississippi for investment or
development purposes.  Dewayne Deer was an attorney
licensed to practice law in Mississippi, and was
employed by Phillips in various legal capacities during
the course of his business dealings.  Dawn Stinson was
secretary and assistant employed by Phillips throughout
the time period named in the charging instruments.  The
investigation further revealed that beginning around
March 2003, Phillips conspired with Deer, Stinson, and
others to commit bank fraud, in that he repeatedly
pledged the same parcels of encumbered real property as
collateral for commercial loans in the names of
Statewide Realty and TPI, while fraudulently
representing to the lenders, financial institutions, and
to title insurance companies associated with the loan
transactions that TPI held unencumbered title to the
real property, and the lender consequently would receive
a priority security interest in the property as
collateral for the respective loans.  These
misrepresentations were material to the funding
decisions of the financial institutions and to the
issuance of related title commitments and policies by
title insurance companies.  In support of these
misrepresentations, Phillips and others provided
fraudulent title opinions and other documentation,
including but not limited to fabricated cancellations of
deeds of trust.  He also caused these fraudulent deeds
of trust to be filed (or filed by him) with the Chancery
Courts in various counties by court employees.

At the restitution hearing, the government presented the

testimony of Special Agent Marten L. Williams of the FDIC's Office

of Inspector General, who claimed $7,099,643.01 as the

"approximate" amount of actual loss incurred by the victims of

Phillips' fraudulent scheme.  The government also presented the testimony of attorney Derek Henderson, who served as bankruptcy trustee for TPI.  Henderson testified that the TPI bankruptcy estate had paid $595,682.60 to four of the victims of Phillips' fraud, which were also creditors in TPI's bankruptcy.  In its post-hearing submission, the government asserts that twelve of Phillips' victims are owed a total of $6,035,685.29.  For his part, Phillips maintains that two victims are owed $628,660.[1]

The parties do not dispute that restitution by Phillips is mandatory under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. §§ 3663A–3664 (MVRA), which directs that when a defendant is convicted of one or more of certain offenses, including bank fraud, the court "shall order restitution to each victim in the full amount of each victim's losses as determined by court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1).  See also <u>United States v. Reese</u>, 998 F.2d 1275, 1282 (5th Cir. 1993) (stating that MVRA defines exclusive measure of restitution).  The Act defines a victim as:

> a person directly and proximately harmed as a
> result of the commission of an offense for
> which restitution may be ordered including, *in
> the case of an offense that involves as an*

---

[1]     The court notes that at the hearing, both government witnesses were extensively cross-examined by Phillips, who presented no witnesses of his own.

> *element a scheme, conspiracy, or pattern of*
> *criminal activity, any person directly harmed*
> *by the defendant's criminal conduct in the*
> *course of the scheme, conspiracy, or pattern*.

18 U.S.C. § 3663A(a)(2)(emphasis added).  The restitution order
must be limited to the victim's actual losses "caused by the
specific conduct underlying the offense of conviction."  United
States v. Arledge, 553 F.3d 881, 899 (5th Cir. 2008), cert.
denied, --- U.S. ----, 129 S. Ct. 2028, 173 L. Ed. 2d 1088 (2009).
Significantly, "[w]here a fraudulent scheme is an element of the
conviction," as is the case with bank fraud, see 18 U.S.C. § 1344,
"the court may award restitution for actions pursuant to that
scheme," see United States v. Inman, 411 F.3d 591, 595 (5th Cir.
2005) (internal citations and quotations omitted).  See also
United States v. Maturin, 488 F.3d 657, 661 (5th Cir. 2007) (since
MVRA "broadens the definition of the term 'victim' for any
'offense that involves as an element a scheme, conspiracy, or
pattern of criminal activity' to include 'any person directly
harmed by the defendant's criminal conduct in the course of the
scheme, conspiracy, or pattern,' . . . this court has held 'that
where a fraudulent scheme is an element of the conviction, the
court may award restitution for actions pursuant to that scheme'")
(citation omitted).  However, "the restitution for the underlying
scheme to defraud is limited to the *specific* temporal scope of the
indictment."  Inman, 488 F.3d at 595.

4

In cases involving the loss of property, such as loan proceeds, the MVRA requires that the defendant either return the property or, if that is "impossible, impracticable, or inadequate," to pay "the greater of ... the value of the property on the date of the damage, loss, or destruction; or ... the value of the property on the date of sentencing, less ... the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). <u>See also</u> <u>Reese</u>, 998 F.2d at 1283 (examining Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663 (VWPA), and concluding that property as to which victim may have suffered "'damage to or loss or destruction' could only be loan proceeds funded in cash at closing").[2]  In addition, the MVRA includes in the amount of restitution "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4).  The court, however, may not award a victim consequential damages. <u>United States v. Onyiego</u>, 286 F.3d 249, 256 (5th Cir. 2002).

---

[2]    The MVRA makes restitution mandatory for the crimes it covers, and the VWPA provides for discretionary restitution for the crimes it covers.  <u>See</u> 18 U.S.C. § 3663(a)(1)(A)(excluding from the VWPA "offense[s] described in section 3663A(c)").  Although the two Acts do not overlap, they are similar and for the most part, cases decided under one act generally serve as precedents for the other.  3 <u>Fed. Prac. & Proc. Crim.</u> § 546 (4th ed. Supp. 2011).

The burden of proof is on the government to demonstrate by a preponderance of the evidence the amount of loss sustained by a victim.  18 U.S.C. § 3664(a),(e).  In determining the appropriate amount of restitution, the court "may consider affidavits and letters by the injured party[,] . . . and may consider other hearsay evidence that bears minimal indicia of reliability so long as the defendant is given an opportunity to refute that evidence." Reese, 998 F.2d at 1282 (determining appropriate amount of restitution under VWPA, under which restitution may be ordered at the judge's discretion).

In determining the amount of restitution to be paid, the court may not consider the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source.  18 U.S.C. § 3664(f)(1)(B). However, in structuring the restitution order,

> [i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

18 U.S. § 3664(j)(1).

Where a defendant has entered into a civil settlement with a victim under which the victim has agreed to release the defendant from all civil liability, the court retains the discretion to impose restitution in spite of the civil settlement.  United

6

States v. Sheinbaum, 136 F.3d 443, 447 (5th Cir. 1998).  The effect
of a civil settlement on criminal restitution "depends upon the
payment made in the settlement, whether the claims settled
involved the same acts of the defendant as those underlying his
criminal conviction, and whether the payment satisfies the penal
purposes the court sought to impose."  Id. ("courts possess the
discretion to impose restitution orders in spite of civil
settlements"); United States v. Calbat, 266 F.3d 358, 365 (5th Cir.
2001)(same).  In the event the court determines that a restitution
award is appropriate despite a civil settlement, the court must
"reduce the size of its restitution order by any amount received
by the victim as part of the civil settlement" to avoid double-
counting.  Id.; see also § 3664(j)(2) (stating that any amount
paid to a victim under an order of restitution shall be reduced by
any amount later recovered as compensatory damages for the same
loss by the victim in state or federal civil proceeding).  It is
the defendant's burden to establish an offset.  Sheinbaum, 136
F.3d at 449.

     Before considering losses with respect to each alleged victim
of Phillips' fraud, the court notes that the government takes the
position that the majority of the victims to whom restitution is
owed are entitled to recover interest and/or attorney fees.  With
respect to interest, the government argues that the inclusion of
the victims' bargained-for interest is proper to ensure that they

are made whole.  See United States v. Rochester, 898 F.2d 971, 974 (5th Cir. 1990) (pre- and post-judgment interest may be included in restitution award under VWPA).  In response, Phillips does not seem to deny that, as a general proposition, restitution under the MVRA may properly include interest.  He maintains, however, that such an award would not be appropriate to any of his alleged victims because, in his view, the government has failed to prove either the time period of the interest or "exactly what the interest is based upon."  He further objects that in any event, interest may not be awarded at a "penalty rate," rather than a negotiated interest rate since "[s]uch a penalty exceeds the goals of the restitution statutes and provides the victims a profit, rather than simply making them whole."

In the court's opinion, the government has developed a sufficient evidentiary basis to include interest amounts in the restitution order in those instances where the court finds that an award of restitution is proper.  Agent Williams testified that in calculating the amount of restitution due the banks, he and Special Agent Susan McDavitt considered both information received from communications with, and documents received from the banks, and further explained that the amounts sought by the government as interest constituted bargained-for (yet unpaid) interest on the loans that Phillips had fraudulently obtained.  Based on Williams' testimony, the court finds, from a preponderance of the evidence,

that the interest sought as restitution to the lender victims is bargained-for yet unpaid interest, at rates set forth in the parties' contracts, which is properly recoverable as restitution.[3]

The government maintains that reimbursement of attorney fees is explicitly authorized by § 3664A(b)(4), which states that a defendant must reimburse victims for "for lost income ... and other expenses incurred during participation in the investigation or prosecution of the offense." Under the statute, attorney fees and other litigation expenses may properly be included in a restitution award where "incurred during participation in the investigation and prosecution of the offense." See United States v. Dwyer, 275 Fed. Appx. 269, 270 (5th Cir. 2008) (affirming award of legal fees incurred in victim's investigation of employee's embezzlement, where information gathered was turned over to FBI and U.S. Attorney, thereby "enabling the government to prosecute Dwyer without conducting a significant investigation"); United States v. Beaird, 145 Fed. Appx. 853, 855 (5th Cir. 2005) (inclusion in restitution order of "attorneys' fees and litigation expenses, associated with assistance to the FBI in the investigation of Beaird's offense"). In the court's opinion,

---

[3]   Obviously, it would have been helpful for the government to have presented the court with the documents which Agent Williams testified manifested the bargained-for interest rates, and detailed proof as to the victims' interest calculations. However, and notwithstanding this omission, the court found Williams' testimony on this point adequate and credible.

however, this case does not involve attorney fees incurred as a
result of the victims' participation in the investigation or
prosecution of the offense.  The government has offered no proof
purporting to link the attorneys' fees at issue to the
investigation and/or prosecution of this case.  Instead, Agent
Williams has described the attorney fees in the government's
restitution computations as "fees that [the victims] incurred to
try to clean up their security and try to get their security sold
and basically the fees that they incurred to try to work out who
was in priority position."  So understood, these attorneys' fees
constitute consequential damages and are not allowed under the
statute.  Cf. Onyiego, 286 F.3d at 256 (reversing restitution
award which included legal fees incurred when the victim travel
agency was forced to defend legal actions brought by various
airlines on account of blank airline tickets which were stolen
from the victim's office); United States v. Schinnell, 80 F.3d
1064, 1070-71 (5th Cir. 1996) (stating, "We must agree with
Schinnell that the district court erred in including ... expenses
incurred by [the victim] for ... "'accounting fees and cost to
reconstruct the bank statements for the time period that the
defendant perpetuated this scheme, temporary employees hired by
the company to reconstruct the monthly bank statements, and costs
incurred by the company [in borrowing funds] to replace the stolen
funds'"); United States v. Mitchell, 876 F.2d 1178, 1184 (5th Cir.

10

1989) (stating that "[t]here is no provision (in the Restitution
Act) authorizing restitution for lost income, cost of restoring
property to its pre-theft condition, or cost of employing counsel
to recover from an insurance company."). Accordingly, the
restitution order will not include amounts for attorneys' fees.

Likewise, the category of expenses denominated by the
government as "Other fees" are consequential damages, which are
not allowable under § 3663A(b)(4). Agent Williams described these
expenses as including "the back taxes, the insurance and the
appraisal," not as amounts incurred during participation in the
investigation or prosecution of the offense.

Turning to the specific losses alleged by the government to
have been suffered by the individual alleged victims of Phillips'
fraud, the court makes the following findings:

Concordia Bank & Trust:

The PSIR recites, and Phillips does not dispute, that he
applied for a $800,000 loan from Concordia to supply TPI with
lines of credit, and that at the time Concordia made these loans,
it was unaware that the collateral offered to secure the notes,
certain real property in Natchez, Mississippi,[4] had been
previously pledged as collateral to secure loans from two other
lenders. The government asserts that Concordia's actual loss is

---

[4]     According to Marten's testimony and the PSIR, two
buildings, the WIC and USDA Buildings, were situated on this
property, referred to as the Northgate Property in the PSIR.

$1,064,121,43, which includes the principal balance of $800,000 on these loans, Loan Numbers 5703409 and 5704855, together $169,349.11 in interest, $65,515.83 in attorney fees and $29,256.49 in "other fees."

Phillips takes the position[5] that since Concordia now owns at least some of the collateral which secured the loans, it follows that Concordia's loss does not include the full $800,000 principal loan amount, and that this amount must be reduced by the value of the property which has been returned to Concordia.  He also contends that the $800,000 figure should be reduced by some yet-to-be-determined amount pursuant to an agreement between TPI's bankruptcy estate and Concordia.  The former argument relates to the government's burden to prove Concordia's actual loss, while the latter involves Phillips' burden to prove he is entitled to an offset of the restitution amount.

Pursuant to § 3663A(a)(3)(b), in calculating the amount of loss of loan proceeds for purposes of restitution, there must be a reduction for "the value of any part of the property that is returned."  In examining a restitution order in a VWPA case where

---

[5]     Phillips' attorney, with a few "exceptions and additions" of his own, adopted the statement of applicable law and restitution contained in the post-hearing memorandum submitted on behalf of Dwayne Deer.  The court observes that Phillips did not take care to specify the instances wherein he intended to "except" himself from Deer's arguments and those instances where he intended to add to Deer's arguments.  Thus, the court has viewed all of Phillips' arguments as "additions."

the victim suffered "damage to or loss of or destruction of" loan proceeds, the Fifth Circuit in Reese held that the district court erred by failing to take into consideration the appraised value of collateral which was returned to the victim in a settlement in lieu of foreclosure.  Reese, 998 F.2d 1284.  The Fifth Circuit observed that, "[c]onceptually, it would seem to us that when a lender accepts conveyance of the secured property in lieu of foreclosure, the value of such property should constitute a partial return of the 'cash loan proceeds.'" Id.; see also United States v. Holley, 23 F.3d 902, 915 (1994) (reversing district court where restitution order did not credit the value of collateral securing loan which was returned to victim via foreclosure and stating that "when the real property that secures such a loan is deeded back to the financial institution, "'the value of such property should constitute a partial return of the "cash loan proceeds"'")(quoting Reese, 998 F.2d at 1284); United States v. Campbell, 106 F.3d 64, 69 (5ᵗʰ Cir. 1997)(holding that bank which loaned defendant $90,000 was not entitled to restitution where bank had previously received $123,917.82 from sale of collateral which had been returned by defendant).[6]

---

[6]     Phillips has additionally argued that the amount of Concordia's loss should be offset by the rent that Concordia has received from the buildings' tenants since the property was returned.  This position has no merit.  See Reese, 998 F.2d at 1283 ("We see nothing in the statutory provision which would give a defendant credit for the gain on resale realized after the return of the property.").

There is apparently no dispute that the original loan amount
was $800,000 and that some portion of the collateral for the loan
has been recovered by Concordia.  However, no evidence has been
presented as to the cost, if any, to Concordia to recover the
property, or as to the value of that collateral.  At the hearing,
Agent Williams testified that at some point, Concordia paid off
BancorpSouth's first deed of trust on the property that was the
collateral for the loan; but he did not know what Concordia paid
to gain first priority or the value of the property which was
returned.  Henderson likewise did not know the value of the
property.

The court would be warranted in denying any restitution for
Concordia in light of the government's failure of proof.  However,
Phillips himself appears to acknowledge that Concordia has likely
suffered a loss, and he urges only that the computation of the
amount of restitution he will owe must account for the value of
the returned collateral.  Accordingly, rather than deny outright
any restitution for Concordia, the court, prior to finalizing its
restitution order, will give the government the opportunity to
supply the missing information.

With reference to Phillips' argument for an offset of the
actual loss amount, Henderson, TPI's bankruptcy trustee, testified
that during the pendency of the bankruptcy, Concordia bid on and
took a parcel of the bankruptcy estate's commercial property

14

located in McComb, Mississippi.[7]  An agreement was thereafter reached between Concordia and the bankruptcy estate that if the property was sold for a profit, Concordia would apply the profit to reduce its loss on the Natchez loan.  Henderson did not know if the parcel had been sold.  Assuming for the sake of argument that Phillips is entitled to the benefit of the agreement between the bankruptcy estate and Concordia, he has offered no proof that Concordia has sold the McComb property or, more pertinently, that it has realized a profit from any sale of such property.  Thus, the court lacks necessary information to determine an offset amount.

As to Concordia, therefore, the court directs that the government shall have thirty days to present proof upon which the court may determine the loss amount.  Further, in the interest of fairness, the court will also allow Phillips thirty days to present additional proof in support of his claim that he is entitled to an offset.

The First Bank:

---

[7]     According to Henderson, Concordia bid on a piece of property "next to the Mall property."  While no party has purported to specifically identify this property, in trying to piece together this puzzle, the court has reviewed the PSIR, from which it gathers that the subject property is 303A Mall Drive, McComb, Mississippi.  The court notes that although Concordia did not take a security interest in this property in connection with its loans to Phillips, two other victims did have security interests in the 303A Mall Drive property.

According to the government, Phillips received five loans
from The First Bank, collateralized by three different properties.
Loan Numbers 9034692 and 9042466 were collateralized by property
in Columbia, Mississippi, in Marion County.  Loan Number 9034978
was secured by the Social Security Building in McComb,
Mississippi, in Pike County, while Loan Numbers 9035885 and
9045422 were secured by the USDA Building in Purvis, Mississippi,
in Lamar County.[8]  The government submits that as a result of
Phillips' fraud, First Bank is owed $404,245.09, consisting of
$485,501.15 in principal, $199,660.94 in interest, $68,946.24 in
attorney fees and $35,136.72 in other fees, less $385,000 received
from TPI's bankruptcy estate.

The Court first concludes that First Bank is not entitled to
restitution for any loss relating to the loans secured by the
Marion and Lamar County properties.  In the court's opinion, based
on its review of the complaint and the transcript from Phillips'
plea hearing, any loss sought with regard to these properties does
not spring from the fraud scheme to which Phillips pled guilty, a
scheme to defraud banks by double-pledging real property, which

---

[8]    According to the PSIR, First Bank loaned Phillips
$800,000 secured by the Social Security Building.  Five months
after the loan was made, Phillips created a fraudulent
cancellation of First Bank's first deed of trust, which provided
to Wachovia's closing agent, Closing and Title Services, to induce
Wachovia to loan him $856,000 in exchange for a first deed of
trust on the Social Security Building.
    The PSIR does not purport to detail the transactions related
to the Lamar and Marion County properties.

involved fraudulent representations to lenders and title companies that Phillips held unencumbered title to property.  United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004) ("When a defendant is convicted of fraud pursuant to a *plea agreement*, ... this Court looks beyond the charging document, and defines the underlying scheme by referring to the mutual understanding of the parties."). Agent Williams testified that the fraud in connection with the loans for the Lamar and Marion County properties related to Phillips' having provided an inflated square footage as to each of these buildings, leading First Bank to make loans that it would otherwise not have made or to loan Phillips more money than it would have otherwise.  Although Williams did not purport to tie any specific portion of the claimed restitution amount to these properties, relying instead on the bottom-line figure provided by First Bank, he did maintain that there was a loss related to these properties on account of Phillips' having provided First Bank with an inflated square footage.  However, the PSIR does not in any way describe this behavior as part of Phillips' fraudulent scheme and further, it makes no mention of either the Pike or Lamar County properties.  Likewise, there was nothing in Phillips' plea hearing to indicate that his inflating square footage was part of the scheme to which Phillips pled guilty.  The court thus concludes that the government has not shown that Phillips' actions relating

to these properties were within the scope of the scheme to which he pled guilty.

Phillips contends that he should not owe any restitution to First Bank relating to the loan ostensibly secured by the Social Security Building in McComb since TPI's bankruptcy estate entered into a civil settlement with First Bank pursuant to which First Bank agreed to release TPI from all civil liability.  Citing Sheinbaum, 136 F.3d at 447, he argues that since First Bank has already been compensated in connection with this loan, then he is not required to pay restitution.  Relating to this settlement, Henderson testified that in his capacity as TPI's bankruptcy trustee, he reviewed the liens that First Bank and Wachovia had on the Social Security Building in McComb and noticed that both lenders' deeds of trust were flawed in ways unrelated to Phillips' criminal behavior.  He challenged the deeds of trust in the bankruptcy proceeding, and as a result of this challenge, First Bank entered into a settlement with TPI's bankruptcy estate, pursuant to which First Bank received a four-ninths share of the sale of the property as well as a four-ninths share of the lease proceeds, totaling $389,667, in exchange for First Bank's complete release of all claims against TPI relating to the subject loan. The bankruptcy court approved the settlement on October 5, 2007.

By virtue of the bankruptcy settlement, First Bank received a significant amount toward its loss on the Social Security

Building, a loss which was not entirely attributable to Phillips, but which was owed in part to the negligence of First Bank's agent; and it released TPI from all further liability.  The court, having considered the circumstances of the settlement, concludes that Phillips is entitled to the benefit of the settlement, and of First Bank's release as part of that settlement.  See Sheinbaum, 136 F.3d at 447 (effect of a civil settlement on a criminal restitution "depends upon the payment made in the settlement, whether the claims settled involved the same acts of the defendant as those underlying his criminal conviction, and whether the payment satisfies the penal purposes the court sought to impose").

<u>Fidelty National Title Insurance</u>

Fidelity National Title Insurance (Fidelity) insured the deeds of trust for First Bank on the Social Security Building and for Wells Fargo Home Mortgage on a home in Gloster, Mississippi, and another in Summit, Mississippi.  According to the government, Fidelity suffered an actual loss of $50,000 in principal and $14,390.04 in attorneys' fees in connection with First Bank's deed of trust on the Social Security Building in McComb, while it sustained a loss of principal of $63,770, arising from the Gloster home and of $64,890 on the Summit home.  Thus, the government maintains that Fidelity is entitled to restitution in the amount of $193,050.04.

19

In response, Phillips does not dispute that Fidelity is
entitled to restitution related to claims on the deeds of trust
for the two homes.  However, he maintains that the government has
failed to demonstrate that his criminality is the cause of
Fidelity's losses related to the Social Security Building, and
asserts instead that Fidelity paid First Bank's claim because of
an unrelated error on the deed of trust which was filed in the
chancery court.  Under the MVRA, a "victim," "in the case of an
offense that involves as an element a scheme, conspiracy, or
pattern of criminal activity," is defined as "any person directly
harmed by the defendant's criminal conduct in the course of the
scheme, conspiracy, or pattern."  In the court's opinion, the
cause of Fidelity's loss in connection with the Social Security
Building in McComb was unrelated to Phillips' criminal conduct,
and accordingly, Phillips is not responsible for restitution on
account of Fidelity's loss in this regard.

Parish National Bank

The government maintains that Parish National Bank (PNB) is
entitled to restitution in the amount of $347,402.24 on account of
Phillips' bank fraud, which includes $297,998.35 in unpaid
principal and $49,403.89 in interest.  Phillips disputes that the
asserted loss was caused by fraud and maintains, instead, that in
connection with the sale of his residence, which secured a

20

Case 3:08-cr-00051-TSL-FKB   Document 41   Filed 06/16/11   Page 21 of 31

construction loan by PNB, the bank failed to request that two
other loans that it held be paid out of the sale proceeds.

The PSIR sets forth the following regarding this lender:

On July 17, 2006, bank officials with Parish National
Bank (PNB) met with detectives with the St. Tammany
Parish Sheriff's Office, in reference to a complaint of
bank fraud, and determined the following.  On April 22,
2005, James Todd and Shelly Phillips obtained a loan
from PNB in the amount of $800,000.00 for the
construction of a home located at 141 Riverwalk in
Madisonville, Louisiana.  On July 14, 2005, the Phillips
obtained another loan from PNB in the amount of
$303,000.00 to complete construction of the home.  The
second loan was secured through cross-collateralization
on the first loan.  On October 28, 2005, the Phillips
obtained a third loan from PNB in the amount of
$356,000.00.  This loan was secured by collateral of
both Lot 4, Lakeview Court, in Covington, Louisiana, and
the first loan.  On March 7, 2006, the Phillips entered
into a contract to sell the residence at 141 Riverwalk
in Madisonville.  Mahony Title contacted PNB to obtain
the payoff of the original loan, and received the payoff
for the original loan, which was $799,014.22.  The
second and third loans from PNB were not included in the
settlement of the property, but should have been paid to
PNB at closing.  Instead, $303,000.00, the amount of the
second loan, and $356,000.00, the amount of the third
loan, was paid to James and Shelly Phillips.

After the closing on this property was complete, the
Phillips received $1,095,219.06.  The PNB bank officials
advised the detectives that once they learned that the
additional loans were not paid at closing, they
attempted to collect the extra money obtained by the
Phillips.  PNB received three checks from TPI to "pay
down" the outstanding loans.  The first check, made
payable to PNB, was in the amount of $4,500.00.  PNB
attempted to pass this check through on two occasions
and each time it came back indicating insufficient
funds.  The second and third checks, both dated May 23,
2006, also made payable to PNB, were each in the amount
of $4,500.00, as well.  Todd Phillips spoke with PNB
official Stacie Kraft and requested that she hold the
second and third checks as he had stopped payment on
them.  PNB officials told the detectives that all

21

attempts to collect the money owed by the Phillips had
been futile.  Todd Phillips was charged with Collateral
Security Violation [in state court].  The trial in that
case has been continued until after Phillips is
sentenced in the instant offense.

In the court's opinion, the loss to this lender was not

occasioned pursuant to the scheme to which Phillips pled guilty.

While it did occur during the time-frame in which the fraudulent

scheme was in play, the government has not shown that Phillips'

failure to pay PNB the money owing on the two other PNB loans was

part of the scheme.  Rather, it appears more likely the failure to

pay was occasioned by PNB's failure to apprise the buyer's closing

agent of the additional amounts which were due.  The government

has not demonstrated that Phillips' transactions with this lender

involved double-encumbered property and/or either fraudulent title

opinions or cancellations of deeds of trust.[9]  Accordingly, PNB is

not entitled to an order of restitution.

---

[9]     At the sentencing hearing, the government argued that
Phillips' actions with regard to Parish National Bank could be
considered by the court as relevant conduct.  While it may be
appropriate to have considered this conduct in calculating his
guideline range, "[t]he standard for 'relevant conduct' under the
Guidelines is more lax than that for determining what conduct can
be the basis of restitution."  United States v. Wright, 496 F.3d
371, 381 (5th Cir. 2007).

Central Progressive Bank

According to the government, Central Progressive Bank is entitled to $740,411.48 in restitution, which includes $500,000 in principal, $102,747.90 in interest, $137,262.19 in attorneys' fees and $401.39 in other fees, relating to Loan Number 1402773 which, based on Phillips' fraud, Central Progressive erroneously believed was secured by a first deed of trust in certain Mall Property located in McComb, Mississippi.  Phillips argues that the government  has failed to sustain its burden to establish the amount of Central Progressive's alleged loss.  He notes that whereas a government exhibit prepared for and presented at the hearing showed a principal loan balance of $500,000 on the Central Progressive loan, the PSIR, in paragraph 16, recites that Central Bank was owed $250,000 on the loan when Phillips defaulted.  Agent Williams, confronted with this discrepancy, did not know which amount was correct.  Phillips also takes issue with the fact that the government's loss figure fails to account for the "offsetting value of any collateral securing the bank's interest."  Finally, he maintains that in light of Deer's settlement with Central Progressive, as evidenced by a consent order entered by the bankruptcy court on December 12, 2009, no restitution should be ordered.

Given Williams' equivocation with respect to the outstanding balance on the Central Progressive loan and his inability to

23

confirm a loss amount of $500,000, the court must conclude the government has failed to establish a principal loss greater than the $250,000 identified in the PSIR.  However, Phillips has cited no authority, and the court is unaware of any, which holds that Central Progressive's retention of a security interest in the collateral, as opposed to having acquired title to the property through foreclosure or by other means, supports a reduction in the loss amount by the value of the security interest.  Lastly, the court is not persuaded that granting Phillips credit for Deer's settlement would satisfy the penal purpose of a restitution award.  Accordingly, the court finds that the government has shown that Central Progressive is entitled to restitution from Phillips in the amount of $301,775.34.

Closing and Title Services LLC and Zurich Insurance Company

An attorney who does business as Closing and Title Services closed a loan for Phillips from Wachovia which was collateralized by the Social Security Building in McComb.  In connection with the transaction, the attorney relied on a fraudulent cancellation of the prior deed of trust that had been filed or caused to be filed by Phillips.  Although the prior security was in favor of First Bank, the cancellation, in addition to being fraudulent, incorrectly recited that the deed of trust that had been satisfied was from "First National Bank of Hattiesburg," rather than from First Bank.  As a result of the attorney's reliance on the

fraudulent cancellation, Wachovia lost its priority position and made a claim against the attorney's error and omissions' policy. Closing and Title Service paid a $5,000 deductible, for which the government seeks restitution, and the errors and omissions carrier, Zurich Insurance Company (Zurich), paid Wachovia $495,000 on account of its insured's reliance on the fraudulent cancellation from Phillips, which amount the government contends Zurich is entitled to recover as restitution.[10]

Although Phillips contends otherwise, the court is persuaded that Closing and Title Services was directly harmed by Phillips' actions taken pursuant to his fraudulent scheme. Phillips produced the subject fraudulent cancellation, on which the closing attorney relied, pursuant to his scheme to double encumber property; and in the court's view, assuming the closing attorney may have been negligent in accepting the cancellation at face value, his negligence does not sever the causal connection between Phillips' fraud and the attorney's loss. Accordingly, restitution in the amount of $5,000 will be ordered for Closing and Title Services. The court likewise concludes that Phillips' fraudulent scheme was also the cause, or substantial cause, of Zurich's

---

[10]    In addition to this transaction, evidence was presented of a second loan closed by the same attorney for Phillips on a lot at Bradford Place. In connection with the Bradford Place loan, the attorney missed a prior deed of trust on the property, which resulted in a claim and payment by Zurich. Any loss in connection with that transaction is unrelated to Phillips, and would not be recoverable as restitution.

claimed loss, and therefore, restitution for Zurich will be ordered in the amount of $495,000.

    State Bank & Trust

    The government contends that State Bank & Trust is entitled to restitution in the amount of $322,192.17, which includes a principal balance of $387,192.17, less $65,000 which was paid by the TPI bankruptcy estate on account of "lent money on Amite County property that was double pledged to Wachovia and condos in Pike County that [were] double pledged to Your Bank."  In response, Phillips maintains that the government has failed to sustain its burden to establish the loss, if any, as to this victim, because Agent Williams was unable to explain the basis of State Bank & Trust's computation of its claimed loss amount, and because the government failed to account for the return of some of the collateral for the State Bank & Trust loan.

    At the hearing, Henderson testified that "State Bank & Trust had received their collateral back," yet Agent Williams could not explain to the court whether State Bank & Trust's calculation of its claimed loss accounted for the return of the collateral.

    Although it is clear the government has failed to prove the amount of State Bank & Trust's loss, the court will give the government the opportunity to address its omission by allowing it to submit to the court, within thirty days, an affidavit detailing the various transactions for which State Bank & Trust seeks

restitution, which affidavit shall outline the principal amount, any payments made and the value of any returned collateral as of the date of its return.  Only with this information can the court properly determine what, if any, restitution is owed to State Bank & Trust.

<u>First American Title</u>

As a result of Phillips' fraudulent scheme, American Bank and Trust made a loan to Phillips, believing it enjoyed a first priority lien position on the Mall Property in McComb, when in fact, there were three prior liens on the property.  First American Title paid American Bank's loss under its title insurance on the loan, and the government contends First American Title is entitled to restitution of $919,949.08 for this loss.

Phillips does not dispute that First American Title has suffered a loss, but he appears to argue either that the loss amount should be reduced by the value of the security interest or offset by a future sale of the Mall Property, which is currently held by another of Phillips' lenders, Pike National Bank.  As previously observed, the court is aware of no authority requiring that the loss be reduced by the value of a security interest. Further, as a future sale of property held by another lender is entirely speculative, Phillips has failed to demonstrate that he is entitled to an offset.  First American is entitled to restitution award of $919,949.08.

27

## Peoples Bank of Franklin County

Peoples Bank of Franklin County (Peoples Bank) loaned Phillips money, erroneously believing, based on Phillips' fraud, that it had a first priority lien position on the Mall Property in McComb.  The government seeks restitution for Peoples Bank in the amount of $421,345.69, which includes $363,883.49 in principal, $43,489.93 in interest, and attorney fees of $18,000, less a payment of $4,027.73 by the bankruptcy estate.  Phillips asserts that no restitution is in order for Peoples Bank, in light of the circumstances surrounding the bank's dismissal with prejudice in 2006 of a lawsuit it had brought against Phillips relating to the lien on the Mall Property.

At the hearing, Henderson explained that in 2006, prior to the commencement of the TPI bankruptcy, Peoples Bank filed a lawsuit against TPI.  To settle the suit, TPI executed a new note, granted the bank a security interest in other collateral, and gave the bank "some money."  As part of the settlement, Peoples Bank dismissed its lawsuit with prejudice.  However, after the bankruptcy was filed, Henderson succeeded in having the transaction crafted by the settlement set aside as a preference, leaving Peoples Bank an unsecured creditor.  According to Henderson, the "new" collateral was ultimately sold and Peoples Bank did receive $4,027 from the sale.

28

In the court's opinion, these circumstances do not support Phillips' claim that he should be allowed an offset on account of this settlement.  The settlement was entered only days prior to Phillips' filing bankruptcy, and it seems improbable that the bank would have made this bargain had it known that TPI was soon headed to bankruptcy.  Significantly, the parties' bargain was effectively undone when the trustee succeeded in setting it aside as a preference.  As Peoples Bank received only $4,027 of the more than $400,000 which is owed, the court is not persuaded that this payment satisfies the penal purpose of restitution.  <u>See</u> <u>Sheinbaum</u>, 136 F.3d at 447.  Accordingly, the court concludes that Peoples Bank is entitled to restitution in the amount of $407,373.47.

<u>Your Bank/Fidelity Homestead Savings Bank</u>

According to the government, Your Bank is entitled to restitution of $1,121,971.70, representing $500,000 in principal, $96,278.17 in interest and $25,692.90 in attorneys' fees on Loan Number 1001535, which was secured by the Northgate Condominiums in Pike County, and $500,000 in principal on Loan Number 1002235, which was secured by the Simpson County Service Center.  Phillips does not dispute the loss figures on Loan Number 1002235; but he contends he is entitled to a complete offset of any amount relating to Loan Number 1001535 since Your Bank successfully sued and obtained a judgment against his father, James Phillips,

related to this loan.  Phillips submits that to order restitution would amount to a windfall for Your Bank.

The court is not persuaded that this amount should be offset. Phillips does not dispute that this loan was made pursuant to the fraudulent scheme to which he pled guilty.  In fact, Agent Williams testified that while Your Bank made the loan to James Phillips, believing him to be the owner because of a fraudulent title opinion by co-defendant Deer, TPI actually owned the property and had previously pledged it to Pike County National Bank.  Granting Phillips credit for Your Bank's judgment against his father would not serve the penal purpose of a restitution order.

Saxon Mortgage

In its post-hearing submission, the government acknowledges payment was made by the bankruptcy estate to Saxon Mortgage, as a result of which Saxon Mortgage is not due any restitution.

Conclusion

Based on the foregoing, Phillips is ordered to make restitution as follows:

| | |
|---|---|
| Fidelity National Title Insurance | $   128,660 |
| The First Bank | $  0 |
| Parish National Bank | $  0 |
| Central Progressive Bank | $   301,775.34 |
| Closing and Title Services, LLC | $     5,000 |
| Zurich Insurance Company | $   495,000 |
| First American Title | $   919,949.08 |
| Peoples Bank of Franklin County | $   403,345.69 |
| Your Bank/Fidelity Homestead Savings Bank | $1,121,971.70 |
| Saxon Mortgage | $  0 |

With respect to Concordia Bank & Trust and State Bank & Trust, the parties shall have thirty days from this date to submit the information referenced _supra_ at pages 15-16 and 26-27, so that the court may determine what, if any, restitution is owed these alleged victims.  Each party may respond to the other's submission within ten days thereafter.  A final restitution order will be entered once a determination is made as to the total amount of restitution owing from Phillips.

SO ORDERED this 16th day of June, 2011.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

31